Good morning. Carl King Davis from Kentucky Legal Aid for Appellant Amanda Hayes. Your Honors, this case presents a long series of facts which are delineated in great detail in our briefs. I hope to not need to go into those in my oral argument. I also do not intend to address one basis for our appeal, which was an abuse of discretion in findings of fact. I believe that issue is also addressed in detail in the briefs, unless the Court has further inquiry. I would like to address my argument to what I believe are the errors of law, which we believe occurred in two instances. First of all, we believe that the District Court judge inaccurately applied the intolerable situation defense as one that was the same as grave risk of harm under Haig and Ikara. We do not believe that this is correct. We believe that a holding that these are two separate defenses is consistent with this Court's early decision in Friedrich, which is in the late 1990s, as well as other cases subsequently, which went further to delineate that these are in fact two separate defenses. We believe that... If they're considered separately, why do you think that will affect a different result? I believe there are two different levels of proof that are required. The judge in this case at page 14, I believe, of his opinion said that while he considered they were the same defense, he was going to discuss them separately. I'm not sure what that means. He may have had a personal opinion that the courts were wrong in considering them separately, but he never delineates what the basis of his opinion is going to be. I believe that under the language of the Convention, it's grave risk of harm, and that is tied to psychological or physical harm, or an intolerable situation. You're arguing the intolerable situation. That's correct, Your Honor. We never argued grave risk. That is one of the errors in the Convention, which spends nearly a page on us arguing grave risk of harm, which we never argued. There were no facts at the time of flight that constituted grave risk of harm as a separate defense. However, intolerable... Intolerability, you're going to address that now, but that's a very malleable sort of standard, is it not? It is, Your Honor, and I believe that is in fact why it is in the Convention. If you read the notes of two drafters who have been quoted, one was a U.K. delegate and there's another delegate that's quoted, as well as the commentary, the Eliza Perez commentary, they put in or intolerable situation because psychological and physical grave risk of harm was so narrow and they could not possibly contemplate all the situations. Now, the law has become somewhat confused because I find it difficult to imagine... It says otherwise, so it's physical or psychological harm or otherwise place the child in an intolerable situation. Doesn't the otherwise suggest that the physical and psychological harm points limit the intolerable situation? Because otherwise, anything is arguably intolerable, including your husband keeping your child and not getting him back. I believe that all situations of physical or psychological harm are going to be intolerable. I do not, however, believe that all intolerable situations are necessarily physical or psychological. If that was the case, there would have been no reason to include... The reason it makes sense to me is if you consider physical and psychological, you could have a situation where there's a revolution and there's great instability, which itself doesn't create physical or psychological harm, but creates a risk of it. So that's why you would have that catch-all. That's accurate, Your Honor. However, if you look at the cases that occurred in 2002, 2004, 2006, for instance, the Tarsabopolis case that we cited, the Hague Convention is child-centered. It's looking at, in the words of one case, would it be to the child's detriment or serve no purpose for the child to be returned to the environment? That is far broader than simply physical or psychological harm. It can't just be the best interest of the child, though, because... No, no, Your Honor. It's the custody standard. No, Your Honor, but I believe there are situations... The way you describe it, it makes it sound like we just sort of use whatever would be the best interest of the child and say anything else is intolerable. I don't believe that that's what the case law says, and I don't believe that that's what we argued. We argued that it is a high standard. It is a clear and convincing evidence stand for it, but it's not just limited to psychological or physical harm. The cases post-Friedrich state that it is the totality of the circumstances, and it can be other instances of a negative impact on the child. High instances, though. We're not talking, and I agree with Your Honor, we're not talking about a substantive custody determination, and the court made that clear. This court made it clear in Friedrich, where it said, at one extreme, there's no educational opportunities or a lack of money. That's clearly not an intolerable situation. That would be what it had as its standard for awarding custody. At the other end of the spectrum, Friedrich gave the opinion of sexual abuse or the threat of sexual abuse as being an intolerable risk. The problem is, sexual abuse would also be a grave risk of harm. I think that's why there has been a confusion, at least in some opinions, as to whether or not you can have an intolerable situation that does not exist, where there's no immediate psychological or physical harm. However, what is also evident in these cases is that intolerable situation involves a threat, and a threat of a deprivation of a right to be safe, or there are other deprivations. There can be, for instance, a deprivation of legal remedies. Are you making a different argument from what I thought was the thrust of your brief, which was based on the fact that they really couldn't get a custody determination in Turkey? No, Your Honor. That is a main point of why this was an intolerable situation. It became actually ludicrous. At the point that Ms. Hayes fled Turkey, the Turkish courts had refused jurisdiction over this case. Facts occurring in July at the last two hearings modify that, but her flight had already occurred based on the intolerable situation that existed that the Turkish courts had said, we can't exercise jurisdiction over this case. They said that in Istanbul when she first filed her case, and they said it in Ankara. Didn't the district court address that? I don't believe that the district court addressed it adequately, Your Honor. But they did address it. He did say that there's these waivers. It's not like he didn't talk about it. The judge said that there had been waivers, but this really now goes to more my abuse of discretion argument, but I believe the grounds on which he considered whether those last waiver produced minutes before court started and was their last waiver, which was believed to be effective by the lower court, there were still issues that placed this child in an intolerable situation. What was that? He was being sent back to Turkey absent legal protections, which he would otherwise have. In Pliego 1, which had been incorporated into the... I don't follow that. I mean, the idea is that in Turkey they make a custody determination. He was sent back to Turkey without any access to the Turkish courts, for instance, for domestic violence protection. And the incidence of events had been found by... The reason to send him back is to get a custody determination, isn't that right? He can only receive a custody determination, number one, if he's alive, to put it to an extreme, to have received that custody determination, and number two, if the courts choose to enforce it. But that goes to where you got hurt, which you're not arguing. So, I mean, you're sort of going back to the other argument you want us to keep, just to... The courts, in order to have a tolerable situation, and the whole premise of the Hague Convention in Ikara is that the jurisdiction to which it's returned not only has some sort of system for making a custody determination, even if it's not equivalent to the U.S. system, but that also that system is going to be used. It's going to be available. And in this case it was not available until July 2nd, which is when everybody was already back here in federal court, and there was a second waiver. Can I ask you a question? Are Pliego and the child still in Turkey? Yes, they are. Everyone is in Turkey. I thought I saw somewhere in the record that they were supposed to leave in June or July of this summer. Oh, Mr. Pliego, we're unclear as to Mr. Pliego... I'm asking a question about mootness, just so you know where I'm coming from. We don't know where Mr. Pliego is. We know the child is still in Turkey. We had thought, and this is my understanding from what I've heard, Your Honors, that his posting had ended. We thought he was going to be posted to the Ukraine. We are not sure where Mr. Pliego is. We know Ms. Hayes is in Turkey, and we know the child is in Turkey in the care of someone. There's an ongoing obligation of the parties to let us know if the case has facts that might moot the case. If you're telling us everything you know, we'll just have to ask the other side as well. It's our understanding that the facts that Mr. Pliego is still in Turkey. That is where we expect him to be. Let's just, since you don't know, you've got time, let's figure out the answer to this. Let's say he's left Turkey. He's been posted to another country. What do we do with the child at that point? At that point, I don't understand how it's capable of repetition and the Turkish problem has gone away because he's not in Turkey. The child's habitual jurisdiction ruling still applies. That was one of our concerns initially, is that the habitual place of residence has been determined to be Turkey. Turkey has jurisdiction. I don't believe where Mr. Pliego goes is going to change that jurisdiction because it's based on the child. Let's say you're wrong about where the child is. Let's say the child and Pliego have gone to his new posting. Would the case be moot then? I don't believe so, Your Honor. It would be subject to additional judicial determination that it would be a violation of an exit visa if the child left because the child was not supposed to leave. But I believe the habitual residence is decided on where the child has been up until the point of removal. And that would have been up until whenever he left. But I think the question is in a different way. If we agree with you on this appeal and we rule for you, what happens then? The case would be then heard... What case? We have asked that the issue be overturned, obviously, substantively and that it be ruled that the proper jurisdiction here. Otherwise, it would be sent back to the... There would be no relief that the district court could give now to undo what it did? I believe that it could be remanded back to the district court for a proper determination of facts or the district... I'm not talking about a proper determination of facts. I'm talking about what relief... Let's say hypothetically we hold that there were intolerable conditions and we give some reason and that's our holding and then we send it back. What happens to the child? Then she left, then Ms. Hayes fled the country with a defense and she would bring a case in the United States. The district court would have to order the child back to the United States in that situation? I believe if you set aside the other... And I understand what Your Honor is asking. If you set aside the other opinion, I believe that it would make the order of return to the United States and the child would have to come back. Reversing it are two very different things. If it makes it moot, then we just throw out the appeal. But if there's something that we would be ordering, I think this... I think the child would have to be ordered to be returned to the United States. I don't know how enforceable that would be, frankly, as a practical matter. That might be the result in the case of an unstayed return order, which gets reversed on appeal. It might be that the child would then be sent back? Yes. If that's the case, then it's not moot. There's a practical application problem as well. Don't answer this now, but I just want to ask you to think about it for rebuttal. For rebuttal, I have just a question about fees. I know you don't want to talk about fees. Fees, Your Honor? Fees, attorney's fees. Fees, yes. And the question is whether the statute contemplates fees incurred at the appellate setting as opposed to the trial setting. So I understand the argument to be it doesn't cover appellate. I just want to hear why you think that on rebuttal. We have wrestled with that, Your Honor. On rebuttal would be great. Thank you. Good morning, Your Honors. May it please the Court. My name is Rebecca McKelvey-Castaneda. I'm the counsel for the petitioner below, the appellee here, Mr. Pliego. Where is he? He is in Turkey, and he has the care of the child. So the statement made by counsel just now that someone has the care for the child, let me just correct that on the record to say that he has the care for the child. He is still there. The case is pending in Turkey. So the custody case that was anticipated by Judge Russell in the district court opinion did in fact happen. The temporary custody hearings were had. Mr. Pliego was given temporary custody. Ms. Hayes has set up residence there in Ankara. She is working there, living there, has been living there for over a year, and his posting has not yet changed to a different place. I thought it was supposed to change this summer. What happened? That's correct, and the trial court there in Ankara continued the case. That trial has been continued a few times. I thought his diplomatic posting was supposed to, Pliego's diplomatic posting was supposed to change this summer. What happened? It was anticipated to change. What happened was this trial kept getting continued. Oh, and the judge was able to say you're not leaving until we figure this out? There's an exit ban on the child. So the judge isn't telling Mr. Pliego he can't leave, but the judge is telling all the parties that there's this exit ban, which was requested by Ms. Hayes initially, if you'll recall. Is he working in the embassy now? At the moment, I don't know the exact status of if he's still in the embassy, but he is. Well, if he's working in some other embassy, then he no longer has diplomatic immunity in Turkey. That's correct, Your Honor. But you can't tell us where he's working. He's your client. That's correct. I don't know if his official posting has been changed to a different place or not. I know that his responsibility... It's kind of a thing you might... I mean, I can see if you didn't want to tell us because it's not in the record or something, but it seems remarkable that you don't even know where your client is working. The reason why I can't say for sure is because even as of just five business days ago, the trial court changed the trial date yet again in Turkey. I don't see what that has to do with where he's working. I don't get that. He's been continuing his posting as long as he can there in Ankara. He has... He has decided that he can stay there until this is resolved. Yes, but the question I don't know how to answer is whether that's in an official capacity as the diplomat or not, or whether he's going to have to get... But can't you tell us where he lives and who's paying his... Yes, I can tell you he lives in Ankara. He has... In the embassy. No, no, no, no, Your Honor. He does not live in the embassy. He's always lived in a place outside the embassy, even during Pliego I and Pliego II. And his posting... His official status affects... Arguably changes the calculus when you're talking about whether he's subject to diplomatic immunity. Is that correct? Yes, Your Honor. It does. The difference here is that all of that immunity as to the child custody case has been waived. So the Spanish state waived... But they say there's still inviolability. They say he's immune from other aspects, like whether he gets tried for child abuse and things like that. But that would all be gone if he was no longer accredited to the embassy. That's true. It would be gone... We just don't know the answer to that. If he doesn't have immunity, it would be gone as to that. But the point here is that his important waivers, the immunity of jurisdiction and execution, those have been waived. But he's still a diplomat in the Spanish Foreign Service posted to Turkey. My understanding is that is correct as of this moment. He still has the immunity, which goes to the heart of your question. He still has the immunity as to every other issue that hasn't been waived. The important things for this case and what was true as of Pliego 2 is that those immunities have been waived to the child custody case. I would think, I don't know if we can tell you to do this, but it would seem responsible if you find out that he is no longer posted to Ankara, but he's just living there. That would be relevant, at least partially, to a mootness analysis and would be something that it would be professional of you to inform the court. Your Honor, the mootness goes to the Chafin opinion from Supreme Court, of the U.S. Supreme Court, which tells us that even when the parent's no longer located in the vigil residence, that doesn't moot the issue of whether the child should have been returned. And that's true for a couple of reasons. Because one of the issues that they raise has to do with the extent to which they're That's correct. When we're evaluating that, we may throw it out or we may find some weight to it. That's part of our jurisdiction, right? Because that's an argument they raise, right? That's correct. If that issue is mooted out by the fact that he's no longer an accredited diplomat in Ankara, I don't see why we can't find that out, why you can't report that to us. You're responding to his question by saying, don't worry about it, see the Chafin decision. That's not a great answer. If the court or a member of the court wants to know the status because they think it's relevant to the inquiry, the answer is we'll find out the status. By the way, it probably won't make a difference given Chafin. I don't know how you can do this any other way. Thank you. I think that's well put and I did intend to convey that as well. What you did intend to convey was that you'll tell us when you find out whether he has diplomatic status in Turkey or not. Is that what I'm hearing? What I can say today that I know for sure is that his diplomat status is still I'm not asking what you can say for sure now. I'm saying when you find out, which shouldn't be too hard or take too long, you'll convey that to us. Is that what you're saying? Yes, Your Honor. I would be happy to. We're looking for that commitment. That would be nice. Yes, we are. Yes. There's some reason why you continually want to circle back to the procedural situation in the court and the status of the trial date. Can you explain that, why you consider that important to answer to us when we're not asking that question? Because it goes exactly to the problem proposed by the appellant, which is that the custody case can't be litigated in Turkey when it in fact can. It can and it has been for the past year that we've been I'm asking, is that tied to your answer about the posting in some other way in your mind, some importance to the posting? I thought that that often came up when you were asked about the posting or his diplomatic status, that you would say, well, the case is getting postponed and it still pens. I think the best way to answer that is to remind the court the child cannot leave Turkey and Mr. Pliego does not want to leave Turkey without the child. So the Turkish court has claimed jurisdiction over this child, intends to litigate the trial. Last I knew, the trial was set for December 29th. That all makes sense to me. I understand that. I just wonder whether we don't have an easier case if he's no longer a diplomat. Maybe he is a diplomat, maybe he isn't. That's the only reason I'm asking that question. But there's a lot of other issues you may want to address. The waiver is the most important issue going to the immunity. And I would submit that that's the key fact that your honors can hang your hat on to understand the immunity issue. The inviolabilities that the appellant raises in her brief, that's a red herring. The Vienna Convention does not say anything about waiving inviolabilities or that that's even an option to do. The two things that Article 31 of the Vienna Convention tells us that can happen is that the Spanish state, in this case, can waive immunity of jurisdiction and immunity of execution. That was done prior to the trial court's decision in Pliego II. So that is the fact that's important for your honors to know, is that without getting too muddled up in whether he has immunity or not, or whether he's still a diplomat or not, respectfully, whatever he has, it was waived. And certainly, the doors open even wider if he's no longer enjoying the privilege of immunity. And of course, if he's reassigned somewhere else, he may have immunity there. We're talking about immunity in Turkey. That's right, because that's the habitual residence. Of course, that's the point that's been conceded in Pliego II by the appellant. All the prima facie elements were conceded by the appellant in this case. Can you address this attorney's fee issue that Judge Sutton raises? Yes, yes. The attorney fees are another reason why it wouldn't make it moot. The fact that the fees were awarded, the fact that they haven't been appealed by the appellant, so they're not at issue before your honor whether to overturn those or not, and we would submit that those can be awarded on appeal. That's consistent with the terms of the convention and ACARA itself that says that attorney fees at all stages of the game can be... It says at all stages in the convention? It does not say that exactly. What does it say? That the attorney fees incurred by the left-behind parent shall be, the court shall award the fees and expenses that that parent had to incur. Does it not say a court ordering the return of a child? Yes, the court ordering... Does the court order the return of a child? This court would not be the court making that decision, but it would be affirming that decision, which Mr. Pliego has been fighting for twice now. That's your point. That's the leap you wish us to make, is that even though you're not the court, you're the affirming court, and that suffices. If this court has the ability to reverse the decision of the district court and therefore perhaps undo the fee award, why would it not also have the power to assign fees from this level of everything that Mr. Pliego has been fighting for to return the child, including this appeal, which includes these issues of race judicata and collateral estoppel, which takes us all the way back to Pliego I, and that's why it's part of the record, because he has been fighting the same fight all along. Ms. Hayes has repeatedly been saying to the district court, and even bringing it up in her brief to this court, that these three sets of circumstances altogether or individually make for an intolerable situation. All of that makes sense. Probably Congress shouldn't have written what it wrote. However, it seems to be what they wrote. It does. It says a court ordering the return, and we would not be a court ordering the return. So how do you get around that? You say, well, that's a bad statute. That falls on our deaf ears. No, I think that it has to be read strictly. Reading it strictly, even if we issue a one-word order affirmed, we would not be a court ordering the return of the child, right or wrong? This court would be affirming that lower court's order. I can't point the court to a Sixth Circuit case where that has happened, but I would submit that the language does support... Is there any case that supports you anywhere? I don't know of a case, Your Honor. We just have to sort of read this loosely. No. Actually, I would submit don't read the convention language loosely. Talk about the statute. And don't read the ACARA statute loosely either. The whole point of the... Well, if you read it strictly, we can't order fees because we're not... How about thinking about it a slightly different way? You have the any court ordering. That's important, and I can understand why that leads to one way of inferring what you can do. But why not put the emphasis on necessary expenses? The question is, what are necessary expenses? And it's fair to call necessary expenses the filing fee for an appeal if someone files an appeal. And if it's possible to have those expenses, why not attorney's fees on appeal? But the test is necessary expenses, not any court ordered. I would agree with that, Judge Sutton. Yes, the necessary expenses that he's had to incur over... Why are we debating this if it wasn't... I wonder how you would respond to the rejoinder that that would suggest that the district court can order fees that are incurred in the court of appeals. It isn't normally the way we do it. You're asking us to order fees, right? We're asking you to consider that on appeal we submit that that would be appropriate. Normally we do that. Normally we are the ones who order fees on appeal. That keeps the district court out of deciding whether to pay for somebody to appeal their decision. This seems to say that if you buy Judge Sutton's suggestion that the district court should be doing it. The... Right? What Mr. Plago doesn't want is a remand to the district court just so that we can tie up the loose ends. Why is that so problematic? It wouldn't be problematic for him except for the time incurred. Ms. Hayes is arguing in Turkey that she is waiting on the decision of this court. Wait, just to hear the question. I don't understand what's so bad for you if the rule is the district court is the one that calculates the fees and enters the order about them and they include fees on appeal. If they include fees on appeal, why do you care about the remand? You're still getting fees for all of this. And so I just don't understand why that's so bad. The only thing that's so bad is it's clear from the record how many fees Mr. Plago has already spent in the course of this case. And over the course of the last two and a half years since the first abduction. There is no... Can we infer then that you're forgoing any fees to the extent that they have to be awarded? Any fees for the court of appeals to the extent they have to be awarded by the district court? Your Honor, if the court finds it necessary to remand for that purpose, Mr. Plago has no problem with that. Mr. Plago's concern here is just getting an affirmance of the lower court's opinion. He's much less worried about the fees on this appeal. He would like to be able to proceed with the Turkish case. If you get your affirmance, you have nothing to worry about. You get your affirmance. They're not challenging the trial level fee award. You get your fees there. It's up to Plago. If he wants to go back to district court to collect the fees incurred on appeal, he can. Let's hope he doesn't because that would be a third time in front of Judge Russell with the same... Well, this would be the one thing both parties agree about. I'm pretty confident Hayes hopes he does not want to collect fees on appeal. So if you agree on that, I'm pretty confident Ms. Hayes will agree on that. I think we can agree on that. The important thing we're wanting to emphasize to your honors is not the fees because we can agree that that's really the lower on the totem pole for the issues, is simply to confirm what the district court found, spent a 21-page opinion elaborating on in its findings of fact. We don't serve to bless opinions. We serve to affirm judgments. If we affirm, then whatever possible undoing of the order is there won't happen. That's got to be the reason that you want affirmance here. We don't sit up here to edit district court opinions or say that they're right or bless them. That's not what we're doing. That's correct, Judge, and I didn't mean to imply... I infer you don't think this case is moot. No. No, absolutely not. So you don't think it's moot presumably because if we rule against you, the district court will be in a position where the district court has to do something that you don't want them to do, like order the child back to the United States? Well, if I could just sum up since I have my time, the decision to return the child to Turkey was perfectly within what the convention in IKARA anticipated. Not only was she not able to meet the burden of proof of the affirmative defense, the one affirmative defense that she claimed and what she's arguing on appeal, but in every other respect either points were conceded or they weren't argued. So there's a lot of proof here why the district court would probably find in Mr. Pliego's favor. There's not a concern of going back to the district court on this issue of fees. The main point is that going back doesn't expedite the case like we're told by the convention to do, and we are trying to keep these parties out of court for one thing. They're in court in the United States. They're in court in Turkey. And I would just submit that we would ask your honors to affirm the judgment of the district court. Let me ask you a legal question, and it's a hypothetical which you would object to arriving, all right, which is that we reverse. Let's just say that we accept the idea that the district court was wrong in saying that there was no intolerable, whatever the standard is, situation, all right? Maybe I had too many negatives in the hypothetical. But assume that you lose on appeal. Just assume, okay? What would you think the district court would properly or arguably properly do in response to that reversal? Nothing because there's nothing to do? Or would the court take steps to undo what it did? What's been the practice where these things get reversed? What's been the practice is that the district court then determines if to further the aims of the convention, as the language says in the convention, the child should still be returned to the country of habitual residence. Which country? To the habitual residence. So whether returning the child still furthers the aim or whether that affirmative defense doesn't further the aim. So the analysis would still be even if this court reverses. Let's assume that he loses on that. Then can the district court undo what it did somehow? On the habitual residence. Not on the habitual residence because that point's been conceded by Ms. Hayes at the trial. I understand that he's a habitual residence of Turkey. But the idea would be that when she took him from Turkey back to the United States, he improperly ordered the child back to Turkey, his habitual residence. If we rule against you on this appeal, that would be at least a possible result is that he erred. I'm asking you to assume that. I know you disagree vehemently. But I'm just trying to figure out what the stakes are here. The stakes for you losing on appeal. If the stakes are nil because he's going to stay in Turkey regardless of whether you win or lose on this appeal, then I'm starting to get feeling moot. But if there's something that the district court might do in order to fix its error, we're assuming it erred just for purposes of my question, what would that be that he might do? Are you with me in my question? I am. I am. And that possibility could, of course, be the child doesn't return and the child stays here. And then Mr. Plague... But he can't stay here because he's not here. He'd have to get here. He'd have to get here. And could the court order him back here, order the parties to send him back here because it made a mistake sending him back to Turkey? Yes, but the court with jurisdiction, which is the Turkish court, has ordered the exit ban. So the child can't leave the country of Turkey, which is why she was prevented the first time from... So it doesn't matter except for these niceties of us blessing what Judge Russell did, whether you win or lose then, is that what you're saying? No. No, not at all. What's the difference? You're not connecting to my question. If there's no way that the district court can legally order him back, then I don't see what the point is of your seeking an affirmance. If the court could enter an order, and maybe that order might or might not be complied with, that would be different, right? He could order, I guess, the mother or the father or whoever to send it back to Kentucky. He could order the father to send it back to Kentucky. Yes. Or not. Are there cases where they undo a reversed decision under ICARA and they try to undo it on remand? No, not that I'm aware of. Conceivably that could happen. Yes, of course it could. If it could conceivably happen, then I don't think it's moot. It's not moot, Your Honor. How does the Turkish court invalidate its ban on the child leaving? Isn't that the biggest problem? One way could be either party making a motion, just regular motion practice in that court. In that Turkish court? Yes, Your Honor. Yes, that would be... The court might give comity to our decision. That is exactly what Mr. Plago has been trying to do for two years, and Ms. Hayes has asked for... If we reverse, then he wouldn't be doing that. Then the other side would be doing that. That's right. So this decision is very important. I think you don't want us to wait for the December hearing. Your client doesn't want us to wait to issue our decision until after the December hearing. I know that this court has its own calendar, and we would just ask. I'm not asking for a decision before or after December, because it's very possible the December hearing could get moved again. But you don't mind if we wait for the resolution of that proceeding, whether December or later? I'm asking whether you care if we wait. It does not matter for the purposes of what this court has been asked to do, which is to review the district court's decision. So I would say, in that respect, it's irrelevant to that point. Judge Russell didn't seem... He was willing to let the Turkish courts decide this case, but he wasn't trying to get them to decide it one way or the other. No, he was very specific about that in his opinion. Thank you, Counsel. Thank you very much for your time. Ms. King-Davis. Your Honors, I'd like to first address, and I have been considering your question, Judge Sutton, but first the question that was asked, what could be done in case this court reversed the lower court decision. The child is prohibited from leaving Turkey right now because Judge Russell, in his order, said the child was prohibited from leaving Turkey. He could not leave Turkey without the permission of the Turkish courts. It would be completely feasible for one party or the other to go to the Turkish courts and request that the orders now in place be lifted and that the child be able to leave if it was ordered that that, in fact, is what should happen. Ordered by Russell. Ordered by Russell. There is an issue right now in Turkey as to whether the Turkish courts, understanding what this court did, it seems to us that there's a hurdle that's being battled in Turkey as well as a substantive of this lower court's order trying to be entered as a substantive order. So to address the second point that I think was very important, we definitely do care about when this court issues an opinion. You want us to do it sooner rather than later? Yes, Your Honor. Even though waiting might confirm your right that it's an intolerably unfair legal system? If you decide that this case should be in Turkey, Ms. Hazel, pursue this case in Turkey, she was already successful in Turkey, and, in fact, this case probably would have been ended had Mr. Pliego not asserted his immunity as soon as she got an order that he didn't like. You run the risk of losing now. In Turkey? No, losing now here. Yes. Not being able to use, in this case, some of the things that happened in this proceeding. That's all I'm saying. I'm just trying to make sure you understand the dynamics of the question. Thank you, Your Honor. The Turkish court, in our understanding with Turkish counsel, is looking at the substantive interest of the best interest of the child. And they are wrestling with issues, trying to figure out what this court is doing. But I don't know that a determination one way or the other is going to affect, if taken as intended under the Hague Convention, is going to affect one way or the other the substantive opinion that's under consideration right now in Turkey. Why do you want us to move fast? Because we have grave concern. Whatever we're doing, we're not deciding the best interest of the child. That's correct, Your Honor. If the Turkish court has to decide the best interest of the child, why do they have to wait for us? We have grave concerns about what is going on in Turkey for all the reasons that have been set out in our brief. We do not believe that the Turkish courts are being allowed to view this case the way they should. We believe that Mr. That's the thrust of your intolerable situation. That is why we do not want. But you get the best evidence of it by letting everybody see what they do. And if they say, oh, he's got immunity, we don't have jurisdiction, you've just confirmed your argument. Now, if it goes the other way, it hurts you. But he doesn't have the Turkish court is not going to find that he has immunity in terms of custody. He's waived that. We agree that he has waived his immunity for the purpose of custody and the purpose of execution under Turkish law and the Turkish courts of execution. Normally, execution goes to monetary damages. What the Turkish court is doing then? Our concern is not with what the Turkish court is doing. Our concern is with, first of all, the fact that things can happen. Yes, because we believe, as said in our brief, that there was undue influence exerted on the Turkish courts. We believe that it's continuing. We now have the Spanish embassy and the U.S. embassy involved in going to proceedings. We review the decision. Pardon me for interrupting. We review the decision of Judge Russell. We don't make our own later decision. Is that correct? I understand. If there's additional evidence, it may go out of mootness, but it doesn't go to whether he properly decided the case. He properly or improperly decided the case based on the record before him. We were concerned about the pattern and practice of behavior up until July 19th when the child was ordered back. And we have no reason to believe that that pattern and practice of behavior is going to change. And even if it did change, the issue is, as testified by our expert, Mr. Pliego still has his immunities from inviolability that prevents any kind of action except for a custody action from being brought against him. And there's proof in the record that this is not some hypothetical that may never arise, that a need for some kind of domestic violence protection may never arise, that their need to physically remove the child may never arise. That's in the record, that these are real concerns. And that's our concern. What's in the record about those concerns doesn't change by what happens later. No, but that would be why we would want it. We review the decision of the district court based on the facts that are before them. That is why we would like a decision sooner as opposed to later. The other issue is the apparent ease with which cases are continued. We'll do it in due course and maybe not look at things that are irrelevant. And I see I'm out of time. Thank you, counsel. We appreciate your advocacy. The case will be submitted.